## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KARL PETERS**                                        **CIVIL ACTION**

**VERSUS**                                                **NO. 17-2598**

**DARREL VANNOY, WARDEN**                  **SECTION: "R"(3)**

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Karl Peters, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On February 7, 2012, he was convicted of second degree murder under Louisiana law.[1]  On February 15, 2012, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On March 13, 2013, the Louisiana Fourth

---

[1] State Rec., Vol. 6 of 8, trial transcript, p. 193; State Rec., Vol. 1 of 8, minute entry dated February 7, 2012.
[2] State Rec., Vol. 6 of 8, transcript of February 15, 2012; State Rec., Vol. 1 of 8, minute entry dated February 15, 2012.

Circuit Court of Appeal affirmed his conviction and sentence.[3]  The Louisiana Supreme Court then denied his related writ application on November 1, 2013.[4]

After unsuccessfully seeking post-conviction relief in the state courts, petitioner filed the instant federal habeas corpus application.[5]  The state filed a response conceding that the application is timely but arguing that petitioner is not entitled to relief.[6]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a

---

[3] State v. Peters, No. 2012-KA-0929, 2013 La. App. Unpub. LEXIS 186 (La. App. 4th Cir. Mar. 13, 2013) (unpublished and unavailable on Westlaw); State Rec., Vol. 6 of 8.
[4] State v. Peters, 125 So. 3d 418 (La. 2013); State Rec., Vol. 6 of 8.
[5] Rec. Doc. 4. Although the case was not officially opened until the filing fee was paid on January 2, 2018, petitioner's application is deemed to have been filed for limitations purposes as of March 27, 2017.  See Spotville v. Cain, 149 F.3d 374 (5th Cir. 1998).
[6] Rec. Doc. 20.

determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.    AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling*

> *on the claim being presented in federal court was so lacking in justification that*
> *there was an error well understood and comprehended in existing law beyond any*
> *possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  White v. Woodall,

134 S. Ct. 1697, 1701 (2014).

## II.  Facts

Petitioner, Karl Peters, was charged with the second degree murder of Terrel Bart.[7]  On

direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of the case as

follows:

> According to Raven Roach, the live-in girlfriend of the decedent, Mr. Peters
> was one of a company of six men who approached Mr. Bart at his home to purchase
> marijuana from him.  They asked Mr. Bart whether they could purchase two bags
> of marijuana for five dollars; the going rate apparently was one bag for that price.
> Mr. Bart declined to let the group buy one and get one free.  After some additional,
> brief negotiations, it was agreed to buy one bag for the standard price.  After
> delivery of the bag by Mr. Bart to the group and the exchange of the payment, Ms.
> Roach upon counting the money realized Mr. Bart, the dealer, had been
> shortchanged two dollars.  In anger Mr. Bart chased after the group, words were
> exchanged, and Mr. Bart told them never to return to him to buy their marijuana.
> According to Ms. Roach, the defendant told Mr. Bart words to the effect that they
> would be back.

---

[7] State Rec., Vol. 4 of 8, indictment.  The Court notes that Bart's given name appears in the state court record as both
"Terrel" and "Terrell."

A short while later, when Ms. Roach returned from a nearby neighborhood store, she encountered Mr. Bart and an unknown man on the front porch of Mr. Bart's home. While she was urging Mr. Bart into the house, Mr. Peters approached. Although she did not actually see a gun in his hand, she testified that the gunfire came from his direction. The unknown man was hit with a bullet and ran through the shotgun house and out the backdoor; he has never been identified or located. Because no one else ever saw this man, Mr. Peters questions whether he even existed.

Mr. Bart also ran into the house. He had been shot four times. The forensic medical examiner stated that the location of his wounds was consistent with being shot first in the chest, then of Mr. Bart turning away and shot toward the side, and then two shots, one in the back and one in the heel. Mr. Bart collapsed under the kitchen table. Ms. Roach, too, unwounded ran into the house. Gunfire entered the house, causing two visitors who were playing video games, to also seek safety in the back of the house. The two visitors, Jesus Arce and Stephen Thornsberry, did not witness the shooting of Mr. Bart.

Ms. Roach, Mr. Arce, and Mr. Thornsberry all testified that they were in the kitchen, Mr. Bart was still alive, and that he repeatedly said that "Karl" had shot him. Mr. Bart was pronounced dead at the hospital shortly after the shooting.

Apparently, Ms. Roach had testified at a previous trial[FN 3] that the decedent had said "Karl Peters." During this trial she admitted that he had not and she now claimed that she learned Karl's last name later that day at the hospital. Mr. Arce testified that he knew exactly to whom Mr. Bart was referring because they knew Karl from the neighborhood. It was established at trial that Mr. Peters lived just a few blocks away from the decedent's home. Mr. Thornsberry did not know to whom Mr. Bart was referring, did not see him, and did not know him. Mr. Thornsberry, however, did select the defendant in a photographic line-up, but testified that he had been prompted by the actions of Detective Richard Chambers. … Ms. Roach and Mr. Arce both testified that they selected Mr. Peters in the photographic line-ups; there was no indication from either that their selections were prompted by the investigator.

[FN 3]  That trial ended in a mistrial.

Several days later Detective Chambers obtained a warrant for Mr. Peters. Following his cautioning with Miranda, Mr. Peters told the detective that he had an alibi; he was at Disney World with his auntie. When the detective was executing a search warrant at Mr. Peters' home, he encountered Tonja Crawford, who identified herself as Mr. Peters' aunt. She told the investigator that she had been to Disney World at that time, but that the defendant was not with her; she repeated this to the jury.

The jury also heard recordings of three telephone conversations between Mr. Peters, who was incarcerated, and others, who were not fully identified. … In one conversation that Mr. Peters was holding with Snake, there was considerable

discussion between them about Mr. Peters' mother being his alibi witness to vouch that he was at home. Snake was warning Mr. Peters to make sure that that alibi would stand up to any other evidence and advising that the first step would be to speak with his mother to be certain that she would testify. And Snake pointed out to him that a new alibi would conflict with the one with the aunt.

In another telephone conversation, when Mr. Peters tells the other person that he has encouraging news that a "law man" in the jail read the police report and told Mr. Peters that he would beat the charge because they are not describing him in the report. The other person points out that although they are not describing him, they are giving his name. In the final conversation, the other person asks Mr. Peters if gun powder was found on his clothes to which he replies, "No. They don't got none of that."

The weapon used in the shooting was never recovered. Nothing of any prosecutorial value was obtained pursuant to the search warrant.

The defense noted several inconsistencies in the testimony of the witnesses. Most prominently, Ms. Roach had told the investigators that there were two shooters and even gave information for two sketches, but at trial she said there was only one shooter. Ms. Roach also admitted that she never furnished the investigators with Karl Peters['] full name, even though she claimed to have known it before the investigators gave her the name. No one but Ms. Roach saw a man at the back door, and no one but she saw the other man on the front porch.[8]

### III. Petitioner's Claims[9]

### A. Sufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support his conviction. On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

The standard of review for sufficiency of evidence applicable to criminal convictions in state courts is set out in Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "After Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Id. "But this inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Id. quoting Woodby v. INS, 385 U.S. 276, 282, 87 S. Ct. 483,

---

[8] State v. Peters, No. 2012-KA-0929, 2013 La. App. Unpub. LEXIS 186, at *5-10 (La. App. 4th Cir. Mar. 13, 2013); State Rec., Vol. 6 of 8. The undersigned notes that Stephen Thornsbery's surname is sometimes misspelled as "Thornsberry" in the state court's opinion.
[9] For ease of analysis, the claims are addressed herein in a different order than they were listed by petitioner in his federal application.

17 L. Ed. 2d 362 (1966). (emphasis added by <u>Jackson</u>).  "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, **any** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Id</u>. (bold emphasis in original); <u>see also</u> <u>Johnson v. Louisiana</u>, 406 U.S. 356, 362, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972), (stating: "Jury verdicts finding guilty beyond a reasonable doubt are regularly sustained even though the evidence was such that the jury would have been justified in having a reasonable doubt.").

In discharging our review function, we consider "*all of the evidence*" before the actual fact-finder.  <u>Jackson</u>, 443 U.S. at 319 (emphasis in original).  The United States Supreme Court has explained that the standard of review for sufficiency of evidence is highly deferential to the fact-finder because it "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  <u>Id</u>.  "The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law."  <u>Id</u>.

Similarly, "[a] reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the <u>Jackson</u> standard of review."  <u>State v. Macon</u>, 06-481, p. 8 (La. 6/1/07), 957 So. 2d 1280, 1285-1286.  "It is not the function of an appellate court to assess credibility or re-weigh the evidence."  <u>Id</u>.  "Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness's testimony, if believed by the fact finder, is sufficient to support a factual conclusion."  <u>State v. Marshall</u>, 04-3139, p. 9 (La. 11/29/06), 943 So. 2d 362, 369; <u>see also</u> <u>State v. Robinson</u>, 10-0885, pp. 7-8 (La. App. 4 Cir. 12/21/10), 54 So. 3d 1208, 1213.

The Due Process Clause of the Fourteenth Amendment, the source of the <u>Jackson</u> standard, does not countenance, much less require, that we re-weigh testimony and witness credibility.  And "[i]n criminal cases [a court of appeal's] appellate jurisdiction extends only to questions of law."  La. Const. art. V, § 10 (B).  <u>See also</u> <u>State v. Barthelemy</u>, 09-0391, p. 24 (La. App. 4 Cir. 2/24/10), 32 So. 3d 999, 1015.

Therefore, in discharging our review function for sufficiency of evidence, we cannot re-weigh or re-consider reasonable inferences drawn from basic facts to ultimate facts.  We must confine ourselves to questions of law except to the extent, and only to the extent, that <u>Jackson</u> mandates otherwise.  <u>State v. Gilmore</u>, 10-0059, p. 5 (La. App. 4 Cir. 10/6/10), 50 So.3d 208, 212.

Second-degree murder is defined as "the killing of a human being ... when the offender has the specific intent to kill or to inflict great bodily harm."  LA. R.S. 14:30.1 A(1).

....

Mr. Peters does not argue that the elements of second degree murder are not established.  The shooting of Mr. Bart was intentional, not accidental.  That the shooting was meant to kill him or do him great bodily harm is self-evident.  <u>See, e.g.</u>, <u>State v. Harris</u>, 02-2434, p. 4 (La. App. 4 Cir. 5/28/03), 859 So. 2d 690, 693.

The only issue of insufficiency of evidence relates to whether Mr. Peters was the shooter and, in that regard, he correctly argues that there is no witness who actually states seeing him firing the weapon at Mr. Bart.

But there is considerable other evidence from which any rational fact-finder could find that Mr. Peters was the shooter. The trial judge admitted testimony of three witnesses, all of whom testified that Mr. Bart's dying declaration was that Karl shot him.[FN 4] There was no evidence offered to contradict these witnesses on this critical point. Ms. Roach testified that Mr. Peters was standing in the area from where the gunshots were being fired and she selected him from the photographic line-up; she had also seen him during the earlier confrontation. Moreover, Mr. Arce testified that both he and Mr. Bart knew Karl and that he knew exactly the person to whom Mr. Bart was referring in his identification.

> [FN 4] See La. C.E. art. 804 B(2): "[a] statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death" is not excluded by the hearsay rule.

The jury also had before it evidence that Mr. Peters lied to the investigator about an alibi with his auntie. And the jury could well infer from his telephone conversation with Snake that he was considering floating another false alibi.

Viewing the facts and reasonable inferences therefrom in the light most favorable to the prosecution, a rational trier of fact could find beyond a reasonable doubt that Mr. Peters was identified as the killer.[10]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[11]

Because a claim challenging the sufficiency of the evidence presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Davila v. Davis, 650 Fed. App'x 860, 866 (5th Cir. 2016). For the following reasons, the Court finds that he has made no such showing.

---

[10] State v. Peters, No. 2012-KA-0929, 2013 La. App. Unpub. LEXIS 186, at *2-12 (La. App. 4th Cir. Mar. 13, 2013); State Rec., Vol. 6 of 8.
[11] State v. Peters, 125 So. 3d 418 (La. 2013); State Rec., Vol. 6 of 8.

As the Louisiana Fourth Circuit Court of Appeal correctly noted, claims challenging the sufficiency of the evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ...  Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.").  Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."  Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman v. Johnson, 566 U.S. 650, 651 (2012).

In the instant case, petitioner concedes that the elements of second degree murder were established at trial; his claim is merely that the state failed to prove that he was the perpetrator.[12]

---

[12] See Rec. Doc. 4-1, p. 22 ("The defense does not dispute that Terrel Bart was killed, nor that the perpetrator had the specific intent to either kill or harm him.  The defense asserts that Karl Peters was not the person who committed the crime.").

However, at trial, Raven Roach identified petitioner and testified that, although she did not actually see a gun in his hand, the gunfire came from his direction.  It is clear that a single, uncorroborated eyewitness identification, if found credible by the trier of fact, is sufficient to prove identity and support a conviction under federal law.  United States v. King, 703 F.2d 119, 125 (5th Cir. 1983); accord Davis v. Cain, Civ. Action No. 15-6652, 2016 WL 4537915, at *7 (E.D. La. May 24, 2016), adopted, 2016 WL 4529877 (E.D. La. Aug. 30, 2016); Colbert v. Cain, Civ. Action No. 14-2472, 2016 WL 4186551, at *11 (E.D. La. Apr. 12, 2016), adopted, 2016 WL 4161257 (E.D. La. Aug. 5, 2016); Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *13 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012).  Here, however, there was additional corroborating evidence, including, most notably, the victim's dying declaration that he had been shot by "Karl."

Petitioner's primary argument is that "the State did not negate all reasonable probability of misidentification."[13]  However, as the United States Fifth Circuit Court of Appeals expressly held in rejecting another prisoner's similar argument:

> Citing to Louisiana law, [petitioner] asserts that, in addition to the Jackson v. Virginia standard, the State was required to negate any reasonable probability of misidentification.  Although Louisiana law has such a requirement when an offender's identity is at issue, see State v. Barthelemy, 32 So.3d 999, 1015 (La.Ct.App., 2010), "in challenges to state convictions under [§ 2254], only Jackson ... need be satisfied, even if state law would impose a more demanding standard of proof."  West v. Johnson, 92 F.3d 1385, 1394 (5th Cir.1996) (internal quotation marks and citation omitted).

Williams v. Cain, 578 Fed. App'x 462, 463-64 (5th Cir. 2014); accord Torregano v. Vannoy, Civ. Action No. 14-1568, 2016 WL 6477045, at *7 (E.D. La. June 29, 2016), adopted, 2016 WL

---

[13] Rec. Doc. 4-1, p. 23.

6441231 (E.D. La. Nov. 1, 2016). Therefore, the state law rule on which petitioner relies to support his claim is simply inapplicable in this federal proceeding.

Lastly, the Court notes that petitioner's argument that the jurors should not have found Roach and the other adverse witnesses credible is likewise misplaced. Credibility determinations are the province of the jurors, and a federal habeas court generally will not grant relief on a sufficiency claim grounded on such matters of credibility. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips, 2012 WL 2564926, at *14; Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

In summary, when the evidence in this case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

## B. Identification

Petitioner also claims that the trial court erred in failing to suppress the identifications made by Thornsbery, Roach, and Arce. The federal law governing such claims is clearly established. The United States Supreme Court has explained:

> [W]e set forth in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and reiterated in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53

L.Ed.2d 140 (1977), the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement. The Court emphasized, first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. Id., at 107, 109, 97 S.Ct. 2243; Biggers, 409 U.S., at 198, 93 S.Ct. 375. Even when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence. Brathwaite, 432 U.S., at 112-113, 97 S.Ct. 2243; Biggers, 409 U.S., at 198-199, 93 S.Ct. 375.

A rule requiring automatic exclusion, the Court reasoned, would "g[o] too far," for it would "kee[p] evidence from the jury that is reliable and relevant," and "may result, on occasion, in the guilty going free." Brathwaite, 432 U.S., at 112, 97 S.Ct. 2243; see id., at 113, 97 S.Ct. 2243 (when an "identification is reliable despite an unnecessarily suggestive [police] identification procedure," automatic exclusion "is a Draconian sanction," one "that may frustrate rather than promote justice").

Instead of mandating a per se exclusionary rule, the Court held that the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification." Biggers, 409 U.S., at 201, 93 S.Ct. 375; see Brathwaite, 432 U.S., at 116, 97 S.Ct. 2243. "[R]eliability [of the eyewitness identification] is the linchpin" of that evaluation, the Court stated in Brathwaite. Id., at 114, 97 S.Ct. 2243. Where the "indicators of [a witness'] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. Id., at 114, 116, 97 S.Ct. 2243. Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury.

Perry v. New Hampshire, 565 U.S. 228, 238-39 (2012). Noting that courts must look to the totality of the circumstances, the Supreme Court further explained:

Among "factors to be considered" in evaluating a witness' "ability to make an accurate identification," the Court listed: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (citing Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

Id. at 239 n.5.

On direct appeal, the Louisiana Fourth Circuit Court of Appeal held that the trial court erred in admitting the identification made by Thornsbery, because the technique employed to

secure that identification was suggestive.  However, the Court of Appeal nevertheless found that

error harmless, explaining:

> One of the witnesses who positively identified Mr. Peters in a photographic lineup, Stephen Thornsbery, testified at trial that Detective Chambers, the detective who executed the photographic lineup, suggested to him which photograph to choose. At trial, Mr. Thornsbery testified that Det. Chambers was tapping on both sides of the page of photographs and then stopped tapping on the picture of Mr. Peters.  Mr. Thornsbery's trial testimony contradicted that of Det. Chambers. …
>
> ….
>
> The burden of proof in showing that an identification was improperly admitted into evidence is on the defendant, see La. C.Cr.P. art. 703 D, to show both that the identification procedure was suggestive and that the procedure likely resulted in misidentification.  See State v. Taylor, 09-2781, p. 2 (La. 3/12/10), 29 So. 3d 481, 482, citing State v. Prudholm, 446 So. 2d 729 (La. 1984).  "An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the defendant."  State v. Thibodeaux, 98-1673, p. 21 (La. 9/8/99), 750 So. 2d 916, 932.  Even though suggestive, however, an identification should not necessarily be excluded unless it likely resulted in misidentification, which we determine using the five-factor test espoused in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L. Ed. 2d 140 (1977).  The factors are "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation."  Manson, 432 U.S. at 114.
>
> The next inquiry, if we find that the identification was improperly admitted into evidence, is whether the error was harmless.  "The question raised by erroneous admission of evidence is whether the trial court's error in admitting it was harmless beyond a reasonable doubt."  State v. Cosey, 97-2020, p. 5 (La. 11/28/00), 779 So. 2d 675, 679, citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed. 2d 705 (1967).  "To be harmless, the improperly admitted evidence must not have contributed to the verdict."  Id., p. 6, 779 So. 2d at 679.  "The inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error."  State v. Buckley, 08-0777, p. 7 (La. App. 4 Cir. 1/14/09), 4 So. 3d 885, 889.
>
> ….
>
> On our review of whether the procedure itself was suggestive, we find that the detective's tapping on the picture of Mr. Peters drew undue focus onto the picture of the defendant, thus resulting in a suggestive identification procedure. Because we find the procedure suggestive, we next turn our attention to whether

the procedure likely resulted in misidentification.  Applying the <u>Manson</u> factors, we need not inquire past the first because Mr. Thornsbery did not actually see the shooting.  There is, therefore, a substantial likelihood of misidentification as to Mr. Thornsbery. …

The admission of Mr. Thornsbery's identification evidence, however, does not justify a new trial because such admission was harmless error.  The jury heard Mr. Thornsbery's testimony regarding the suggestive identification procedure and also heard that Mr. Thornsbery did not see the actual shooting.  The erroneous admission of Mr. Thornsbery's identification surely did not affect the verdict because the jury was able to account for the irregularities in its origin.[14]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[15]

Where, as here, the state court held on direct review that a trial court error was harmless, that decision is considered an adjudication of the constitutional claim "on the merits" and the deferential standards of review set forth in 28 U.S.C. § 2254(d) apply.  <u>Davis v. Ayala</u>, 135 S. Ct. 2187, 2198 (2015).  Therefore, the question for this Court is whether the state court "applied harmless-error review in an 'objectively unreasonable' manner."  <u>Mitchell v. Esparza</u>, 540 U.S. 12, 18 (2003); <u>accord</u> <u>Ayala</u>, 135 S. Ct. at 2198.  In other words, this Court may not grant habeas relief under § 2254 unless it concludes that that the state court's *harmlessness determination* was unreasonable.  <u>Fry v. Pliler</u>, 551 U.S. 112, 119 (2007); <u>accord</u> <u>Ayala</u>, 135 S. Ct. at 2199.

Moreover, in order to conclude that state courts' harmlessness determination was unreasonable, this Court must find that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond *any possibility* for fairminded disagreement."  <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011) (emphasis added);

---

[14] <u>State v. Peters</u>, No. 2012-KA-0929, 2013 La. App. Unpub. LEXIS 186, at *12-16 (La. App. 4th Cir. Mar. 13, 2013); State Rec., Vol. 6 of 8.
[15] <u>State v. Peters</u>, 125 So. 3d 418 (La. 2013); State Rec., Vol. 6 of 8.

accord Ayala, 135 S. Ct. at 2199.  Accordingly, this Court cannot grant petitioner relief on this claim if *a fairminded jurist could agree with the state court's conclusion* that the error was harmless.  Id. at 2199.

Here, the Court has no hesitation in concluding that the admission of Thornsbery's identification was harmless.  Thornsbery testified at trial that *he neither witnessed the shooting nor knew petitioner*.[16]  Therefore, his identification of petitioner's photograph was wholly irrelevant and immaterial, and it could not reasonably be said to have contributed to the jury's verdict.  Accordingly, this Court should defer to the state court's decision denying petitioner's claim that his constitutional rights were violated as a result of the admission of the Thornsbery identification.

The state court also denied petitioner's claims challenging the Roach and Arce identifications, finding that petitioner had failed to prove those identifications were obtained by suggestive procedures.  The Louisiana Fourth Circuit Court of Appeal explained:

> Mr. Peters' grounds for the exclusion of the other photographic identifications, made by Ms. Roach and Mr. Arce, are that because Det. Chambers used an improper procedure in obtaining Mr. Thornsbery's identification and then lied about it, he must have used the same procedure in obtaining the others and lied about them as well.  All three identifications were made the same evening, six days after the murder.
> 
> ....
> 
> … There is no evidence before us, however, that there was a suggestive identification procedure used in obtaining the identifications of [Roach and Arce].[17]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[18]

---

[16] State Rec., Vol. 6 of 8, trial transcript, pp. 69-70.

[17] State v. Peters, No. 2012-KA-0929, 2013 La. App. Unpub. LEXIS 186, at *12-13 and 15 (La. App. 4th Cir. Mar. 13, 2013); State Rec., Vol. 6 of 8.

[18] State v. Peters, 125 So. 3d 418 (La. 2013); State Rec., Vol. 6 of 8.

In this federal proceeding, petitioner likewise opines that since Chambers resorted to suggestive tactics in conducting the lineup for Thornsbery, "there is just as much chance that Chambers did the same type of activity with [Roach and Arce]."[19]   However, that does not necessarily follow because Roach and Arce, unlike Thornsbery, each had an *independent basis* for being able to identify petitioner.  Roach, unlike Thornsbery, was an *eyewitness to the shooting and actually saw petitioner*.[20]  And while Arce did not witness the shooting, he, unlike Thornsbery, *already knew petitioner* from the neighborhood prior to the shooting and was so able to identify him as the "Karl" to whom the victim would have been referring in his dying declaration.[21]  In light of those differences, there is simply no reason to believe that Chambers would have needed to resort to the same tactics to secure the identifications by Roach or Arce.  Those factors, as well as the complete absence of any testimony by any witness that Chambers acted inappropriately during the photographic lineups with Roach and Arce, lead this Court to conclude that there is no basis whatsoever for finding that those identification procedures were suggestive.  Accordingly, there is likewise no basis for concluding that that state court decision rejecting petitioner's claim challenging the identifications by Roach and Arce was contrary to or an unreasonable application of clearly established federal law.  As a result, this Court should again defer to the state court decision and deny the claim.

---

[19] Rec. Doc. 4-1, p. 29.
[20] State Rec., Vol. 6 of 8, trial transcript, pp. 30-31.
[21] Id. at p. 56.

## C.  Admission of Jail Telephone Conversations and Dying Declaration

Petitioner next claims that the trial court erred in admitting (1) recordings and transcripts of telephone calls petitioner made while incarcerated and (2) the victim's dying declaration.  Both of those claims were denied on the merits by the state courts.

Petitioner's claim challenging the admission of the telephone calls was asserted on direct appeal.  The Louisiana Fourth Circuit Court of Appeal denied relief with respect to that claim, holding:

> Mr. Peters' final assignment of error is that the district court erred in allowing the introduction of the recordings of three of Mr. Peters' jailhouse telephone conversations.  The three telephone calls in question were made while Mr. Peters was incarcerated awaiting trial.  Mr. Peters argues that the conversations are not relevant and were prejudicial.  <u>See</u> La. C.E. arts. 401, 403.  Mr. Peters raised the objection in a motion *in limine*, which had been urged in the first trial and was urged again in this trial after a mistrial had been declared in the first.
>
> A
>
> The standard of review over a district court's ruling on the introduction of evidence … is abuse of discretion.  "The district court is accorded great discretion in determining whether evidence is relevant and, absent a clear abuse of discretion, rulings on relevancy will not be disturbed on appeal."  <u>State v. Magee</u>, 11-0574, p. 52 (La. 9/28/12), 103 So. 3d 285, 321.
>
> The relevancy of evidence is defined by La. C.E. art. 401:  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation.  Evidence which is not relevant is not admissible."  La. C.E. art. 402.
>
> The pertinent exception to the general acceptability of relevant evidence is that "[a]though relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."  La. C.E. art. 403.
>
> Our finding that evidence was improperly admitted, however, is not the culmination of our inquiry.  After determining that evidence was improperly admitted, we determine if that admission was harmless error. …

B

The first call is between an unknown individual and Mr. Peters. During that call, Mr. Peters asks the caller to contact his mother and ask her to contact his "paw paw" to ask him to put up his house as collateral on a bond so that he can get out of jail. The two then engage in what appears to be small talk until a second caller enters the conversation. Mr. Peters tells the second caller that he needs either his "momma" or his "auntie" to put up their houses as collateral. The second caller then asks, "They found the gun powder on your clothes?" to which Mr. Peters replies, "No. They don't got none of that."

The probative value of the first call, the State argues, is that Mr. Peters intends to intimidate or kill witnesses while out on bail. This allegation is simply not supported by the conversation or other evidence. The fact that Mr. Peters wished to leave jail and asked family members to put up their houses as collateral is not relevant to the inquiry of whether he may have killed Mr. Bart. Nor, however, is the introduction of such evidence especially prejudicial to Mr. Peters because evidence that he wished to leave jail would not be held against Mr. Peters.

Mr. Peters' statement that gunpowder was not found on his clothes is vague. It could mean that there were clothes with gunpowder on them that the police did not find; or it could mean that he was never around gunpowder, so there was none to be found in the first place. The second caller's use of the phrase "the gun powder" instead of simply "gun powder," however suggests that Mr. Peters was around gun powder. The exchange regarding the gunpowder, therefore, tends to make the fact that Mr. Peters fired a gun that evening slightly more probable. See La. C.E. art. 401. The evidence is, therefore, relevant. There is no potential unfair prejudicial information to be discernable from the statement. The district court did not abuse its discretion in admitting the statement.

C

In the second call Mr. Peters wakes up the other caller and asks for Dominique. Dominique and Mr. Peters' mother had apparently been to court with the caller to see Mr. Peters, but Mr. Peters was not brought to court that day. Mr. Peters then said that he had spoken with a "law man" while in jail, and that man looked at his police report and told him that he would beat the charge because Mr. Peters was not described in the report. The caller responded that although he may not be described in the report, Mr. Peters' name was in the report. The caller then said that he didn't want to talk about it on the phone.

Nothing in this second call is indicative of Mr. Peters' guilt or innocence; it is just Mr. Peters' hopeful speculation. The second call, therefore, is not relevant and should not have been admitted to trial. Reviewing the admission of the second conversation under the harmless error standard, we find, because the evidence is completely irrelevant to Mr. Peters' guilt or innocence, that Mr. Peters' guilty verdict rendered in this trial was surely unattributable to the error. See Buckley, *supra.*

D

      In the third call, "Snake" gives legal advice to Mr. Peters. Snake and Mr. Peters discuss what would be Mr. Peters' alibi now that Mr. Peters' first alibi, that he had been on a trip to Disney World in Florida, had fallen through. Mr. Peters said that he was at his mother's house during the shooting and that he was sure his mother would vouch for him. Snake insisted that Mr. Peters talk to his mother to make sure that she would be taking the stand. The tone of the conversation along with Snake's questioning of whether Mr. Peters' mother would be testifying on his behalf suggest that Mr. Peters' alibi that he was with his mother may have been fabricated.

      Evidence tending to prove that Mr. Peters' alibi was fabricated is extremely relevant to the central issue in the case. Irregularities with Mr. Peters' alibi cast doubt on his claim that he could not have been the person who murdered Mr. Bart. This evidence, while it is substantially relevant to the merits of the case, is also substantially prejudicial to Mr. Peters because it makes him appear dishonest. But because this prejudicial effect does not outweigh the probative value of the relevant evidence, it is not unduly prejudicial and thus not inadmissible. The district court, therefore, did not err in admitting the third conversation.[22]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[23]

Petitioner's claim challenging the admission of the victim's dying declaration was first asserted in the state post-conviction proceedings. The state district court denied that claim, holding:

      As to the dying declaration, the defendant failed to raise this claim in the Appellate Court, which it could have done on his own apart from appellate counsel's brief. Nevertheless, this issue was carefully considered at the trial court level. By ruling of June 8, 2011, the trial Court reasonably found the dying declaration admissible stating:

      Article 804(B)(2) of the Louisiana Code of Evidence clearly allows as an exception to the hearsay rule:

---

[22] State v. Peters, No. 2012-KA-0929, 2013 La. App. Unpub. LEXIS 186, at *16 (La. App. 4th Cir. Mar. 13, 2013); State Rec., Vol. 6 of 8.
[23] State v. Peters, 125 So. 3d 418 (La. 2013); State Rec., Vol. 6 of 8.

A statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.

It is well settled that dying declarations are admissible if made under circumstances where the declarant is aware of his condition and under a sense of impending death. State v. Gremillion, 542 So.2d 1074, 1077 (La. 1989). A victim's statement is admissible, even if elicited by questions. State v. Verrett, 419 So.2d 455, 456 (La. 1982). The necessary state of mind may be inferred from the circumstances surrounding the declaration, including medical testimony concerning the victim's deteriorating physical condition[.] The victim need not express his belief that he is dying if such belief may be reasonably presumed from the facts and circumstances surrounding the declaration. Verrett, supra at 457; State v. Henderson, 95-0267, pp. 5-6 (La. App. 4th Cir. 4/3/96), 672 So.2d 1085, 1089. The more serious the injury and the greater the impairment, the more probable is his belief that the end is near:

[N]o absolute rule can be laid down by which to decide with certainty whether the declarant, at the time of his making his statement, really expected to die, yet when the wound is from its nature mortal, and when, as a matter of fact, the deceased shortly after making his statement died, the courts have uniformly held that the declarant really believed that death was impending, and his statement has been admitted as a dying declaration.

State v. Matthews, 95-1245 (La. App. 4th Cir. 8/21/96), 679 So.2d 977, 981, citing State v. Augustus, 129 La. 617, ___, 56 So.2d 551, 552 (1911). As maintained by the State, the injuries discussed in Matthews, notably a gunshot to the abdomen, are similar to the injuries here. Considering the nature, of the wound, the number of gunshots received, the circumstances of the statement soon after the shooting, prior to transport to the hospital, and that the victim died within an hour and half of the actual shooting, the statement remains ADMISSIBLE under La. C.E. art. 802(B)(2).

Even if the statement is questioned as being a dying declaration it would nevertheless be admissible as a *res gestae* statement under La. C.E. art. 803(2) wherein it provides that "a statement relating to a starting [sic] event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not considered hearsay. The victim uttered the statement to the occupants of the house in the moments after the

> shooting while fleeing the shooter.  Therefore, the statement is also
> ADMISSIBLE as an excited utterance.
>
> The "dying declaration" was admissible for several reasons and there is no
> abuse of discretion evident.[24]

Petitioner's related writ applications were then likewise denied by the Louisiana Fourth Circuit

Court of Appeal[25] and the Louisiana Supreme Court.[26]

The United States Fifth Circuit Court of Appeals has held:  "In habeas actions, [a federal

court] does not sit to review the mere admissibility of evidence under state law."  Little v. Johnson,

162 F.3d 855, 862 (5th Cir. 1998).  Therefore, to the extent that petitioner is arguing that the state

courts misapplied state law in rejecting his claims challenging these evidentiary rulings, that

argument is not cognizable in this federal proceeding.

To the extent that petitioner is instead arguing that the admission of the evidence violated

his federal constitutional right to due process, he fares no better.[27]  The fact that evidence may

have been erroneously admitted in a state criminal trial does not alone warrant federal habeas

corpus relief.  As the United States Fifth Circuit Court of Appeals has explained:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless
> those errors result in a "denial of fundamental fairness" under the Due Process
> Clause.  The erroneous admission of prejudicial evidence will justify habeas relief
> *only if* the admission was a crucial, highly significant factor in the defendant's
> conviction.

---

[24] State Rec., Vol. 1 of 8, Ruling dated December 16, 2014, pp. 2-3.

[25] State v. Peters, No. 2016-K-0454 (La. App. 4th Cir. July 5, 2016); State Rec., Vol. 7 of 8.

[26] State ex rel. Peters v. State, 210 So.3d 790 (La. 2017); State Rec., Vol. 8 of 8.

[27] In its response, the state argues that any federal component of the claims was not fairly presented to the state courts and, therefore, is unexhausted. Rec. Doc. 20, pp. 8-9.  However, because the federal component of the claims, if any, is meritless in any event, the undersigned recommends that the claims simply be denied on that basis out of an abundance of caution.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); accord Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.").

As to the admission of the recordings and transcripts of the telephone calls, that evidence was largely irrelevant to the issue of petitioner's guilt and, in any event, paled in comparison to the more damning evidence of Roach's identification and the victim's dying declaration. Therefore, *even if* the telephone calls were erroneously admitted, petitioner's right to due process was not violated because the calls cannot be said to have played a crucial, highly significant factor in the jury's guilty verdict.  See Gonzales v. Thaler, 643 F.3d 425, 430 (5th Cir. 2011) ("The due process inquiry must consider the significance of the challenged evidence in the context of the entire trial.  We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not so pronounced and persistent that it permeates the entire atmosphere of the trial." (quotation marks and footnotes omitted)).

As to the admission of the victim's dying declaration, petitioner has failed to establish that the trial court's ruling was even erroneous, much less so egregiously erroneous as to render his trial fundamentally unfair.  On the contrary, dying declarations have long been considered a proper form of evidence despite their inherent shortcomings.  For example, as the United States Supreme Court observed more than a century ago:

> [Dying declarations] are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination, nor is the witness brought face to face with the jury; yet from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility.  They are admitted, not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice.  As was said by the chief justice when this case was here upon the first writ of error, the

23

> sense of impending death is presumed to remove all temptation to falsehood, and
> to enforce as strict an adherence to the truth as would the obligation of an oath.

Mattox v. United States, 156 U.S. 237, 243-44 (1895) (citation omitted).  There is simply no reason to believe that petitioner's trial was rendered fundamentally unfair by the admission of the victim's dying declaration – a declaration which was made immediately after his shooting and shortly before his death, *and* which was witnessed by *three individuals* who testified at trial subject to cross-examination.

For all of these reasons, petitioner's claims concerning the telephone calls and the dying declaration should be denied.

### D.  Prosecutorial Misconduct

Petitioner next claims that his rights were violated as a result of prosecutorial misconduct. Specifically, he contends that the prosecutors (1) presented Raven Roach's testimony despite being aware that the testimony was false and (2) made improper comments during closing argument.  In the post-conviction proceedings, the state district court denied the claim, holding:

> The defendant argues that the prosecutor knowingly presented false testimony to the jury.  He argues the changing story of Raven Roach, who was the only witness present at the time of the shooting, as proof that the witness was lying. Two other witnesses were inside the home and verified a portion of her testimony. While the statements evolved in some details of the shooting, they actually weakened her testimony, not strengthened her testimony.  All her inconsistencies were presented to the jury.  The inconsistencies speak to her assumptions on such details as the defendant's last name which she inserted into her memory, but which she retracted when questioned more closely.  This does not mean that she was perjuring herself.  Further, the fact that she qualified her statements that she saw gunfire from the defendant's direction without actually seeing the gun speak to her veracity.  The fact that the defendant asserts this witness was lying because of inconsistent details does not rise to the State knowingly presenting perjured testimony.  This claim is without merit.
> In State v. Jackson, 568 So.2d 599, 602 (La.App. 4 Cir., 1990), the Louisiana Fourth Circuit noted:

> … [E]ven if it is found that the prosecutor's arguments contain improper remarks, an appellate court may reverse the conviction **only** if it is thoroughly convinced that the jury was influenced by the remarks, and that the remarks contributed to the verdict.  State v. Byrne, 483 So.2d 564 (La. 1986), cert. denied, Byrne v. Louisiana, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Carroll, 546 So.2d 1365 (La.App. 4th Cir.1989). [emphasis added]
>
> The defendant highlights two brief arguments by the prosecutor in closing argument.  It should be noted that the Court repeatedly admonished the jury that the prosecutors' arguments were not evidence, merely argument.  The second statement appears to respond to argument by defense counsel and was cut short. While perhaps not proper argument, it is harmless.  The evidence presented to the jury was significant, particularly as his attempts at an alibi fell apart repeatedly.[28]

Petitioner's related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal[29] and the Louisiana Supreme Court.[30]

A claim of prosecutorial misconduct, including the use of false testimony, presents a mixed question of law and fact.  Harvey v. Cain, Civ. Action No. 13-2994, 2013 WL 6490484, at *5 (E.D. La. Dec. 10, 2013).  Therefore, to obtain federal relief, petitioner must show that the state court's decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  For the following reasons, it is clear that he has not made that showing in this case.

It is true that due process may be violated if a prosecutor knowingly uses false testimony at trial or allows untrue testimony to go uncorrected.  Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Faulder v. Johnson, 81 F.3d 515, 519 (5th

---

[28] State Rec., Vol. 1 of 8, Ruling dated December 16, 2014, p. 3.
[29] State v. Peters, No. 2016-K-0454 (La. App. 4th Cir. July 5, 2016); State Rec., Vol. 7 of 8.
[30] State *ex rel.* Peters v. State, 210 So.3d 790 (La. 2017); State Rec., Vol. 8 of 8.

Cir. 1996). However, a petitioner is entitled to relief on such a claim only if he shows that (1) the testimony in question was *actually* false, (2) the prosecutor *knew* it was false, and (3) the testimony was *material*. Duncan v. Cockrell, 70 Fed. App'x 741, 744 (5th Cir. 2003). "Evidence is 'false' if, *inter alia,* it is specific misleading evidence important to the prosecution's case in chief. False evidence is 'material' only if there is any reasonable likelihood that it could have affected the jury's verdict." Id.

Here, petitioner argues that the prosecution must have known that Roach's testimony was false because of the numerous inconsistences in her various statements. However, falsity is not established by mere inconsistencies. Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990); United States v. Bingham, 653 F.3d 983, 996 (9th Cir. 2011) (noting that the fact that a witness has made inconsistent statement does not suffice to state a Napue claim). Rather, such inconsistencies simply present "a credibility question for the jury." Koch, 907 F.2d at 531; Webster v. McCoy, No. 9:030cv-00440, 2007 WL 2292994, at *5 (N.D.N.Y. Aug. 6, 2007) ("Inconsistencies, to the extent they may have existed, between the statements of certain witness contained in the police reports and the trial testimony goes to credibility, but does not necessarily make the testimony false or that the prosecution knew it was false." (footnotes omitted)). Because petitioner has made no showing that the prosecutors had actual knowledge that Roach was testifying falsely, relief is not warranted.

With respect to the prosecutors' comments during closing argument, petitioner notes that the prosecutors referred to him as a "killer." He opines that those comments were improper

because they were unsupported by the evidence and "vouched for the defendant's guilt."[31]
Petitioner's contentions have no merit for the following reasons.

Clearly, it is improper for a prosecutor to express an opinion as to the defendant's guilt *if*
there is underlying an implication that the prosecutor's statements are based on additional personal
knowledge about the witness or the facts of the case which are in not in evidence.  See, e.g., United
States v. Munoz, 150 F.3d 401, 414-15 (5th Cir. 1998); Richthofen v. Cain, Civ. Action No. 05-
5701, 2008 WL 630477, at *49 n.81 (E.D. La. Mar. 7, 2008).   However, such comments are not
improper where it is apparent to the jury that the comments are based on the evidence presented at
trial rather than on personal knowledge of facts outside the record.  See, e.g., Nichols v. Scott, 69
F.3d 1255, 1282-83 (5th Cir. 1995); Richthofen, 2008 WL 630477, at *49 n.81.

In the instant case, when the prosecutors' comments are reviewed in context and in their
entirety,[32] it is obvious that the prosecutors were arguing that petitioner was a "killer" based on
the fact that the evidence at trial proved that he murdered the victim in this case, Terrel Bart.  There
is simply no reasonable basis for concluding that the jurors would have interpreted the comments
as having been based on any personal knowledge of the facts outside the record.  Therefore, the
comments did not violate petitioner's federal constitutional rights.

For all of these reasons, the Court finds that petitioner has failed to establish that his federal
constitutional rights were violated by the prosecutors' conduct.  Accordingly, this claim should be
denied.

---

[31] Rec. Doc. 4-1, p. 24.
[32] The prosecutors' arguments can be found in State Rec., Vol. 6 of 8, trial transcript, pp. 144-50 and 168-93.

### E.  Ineffective Assistance of Counsel

Lastly, petitioner claims that he received ineffective assistance of counsel.  In the state

post-conviction proceedings, the state district court denied that claim, holding:

> The petitioner asserts claims of ineffective assistance of counsel. Ineffective assistance of counsel claims are analyzed under the two prong test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984).  In order to successfully urge this claim petitioner must demonstrate both (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.  Failure to establish either prong is fatal to the claim.  Strickland, 466 U.S. at 687, 104 S. Ct. at 2064 (1984); Murray v. Maggio, 736 F.2d 279, 281 (5th Cir. 1984). The proper standard for judging counsel's performance is that of reasonably effective assistance, considering all the circumstances.  Strickland, 466 U.S. at 689, 104 S.Ct. at 2065; Murray, 736 F.2d at 281.  Scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight.  Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.
>
> As for the second prong, a defendant is prejudiced if there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  Id., 466 U.S. at 694, 104 S.Ct. at 2068; Green v. Lynaugh, 868 F.2d 176, 177 (5th Cir. 1989).  However, if the facts adduced at trial point so overwhelmingly to petitioner's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, the claim of ineffective assistance must fail.  Green, 868 F.2d at 177.  The proper standard for judging counsel's performance is that of reasonably effective assistance, considering all the circumstances.  Strickland, 466 U.S. at 689, 104 S.Ct. 2065; Murray, 736 F.2d at 281.
>
> Defendant complains that his counsel was ineffective for failure to file pretrial motions, properly investigate his case and to make timely objections. Nothing in the record suggests that the defendant would have succeeded in a motion to suppress, or that further investigation would have exculpated the defendant and yielded a different result.  Furthermore, "the filing of pretrial motions is squarely within the ambit of the attorney's trial strategy, and counsel is not required to engage in efforts of futility."  State v. Moore, 2000-2282, 6 (La.App. 4 Cir., 9/26/2001), 797 So.2d 756, 761, quoting State v. Hollins, 99-278 (La.App. 5 Cir. 8/31/99), 742 So.2d 671.  Actually, the defendant quotes sections which defeat his own argument of ineffective assistance of counsel, because counsel used such issues as the ballistic report showing two guns to raise reasonable doubt.
>
> The record reflects diligent efforts by counsel in pretrial motions on identification, dying declarations and to keep the taped phone calls out.  All of defendant's claims are the result of hindsight, and/or appear to be strategy or

outright incorrect.  The defendant's sweeping allegations do not meet either prong of the Strickland test.[33]

Petitioner's related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal[34] and the Louisiana Supreme Court.[35]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim on the merits unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Ibid.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 556 U.S.

---

[33] State Rec., Vol. 1 of 8, Ruling dated December 16, 2014, p. 4.
[34] State v. Peters, No. 2016-K-0454 (La. App. 4th Cir. July 5, 2016); State Rec., Vol. 7 of 8.
[35] State *ex rel.* Peters v. State, 210 So.3d 790 (La. 2017); State Rec., Vol. 8 of 8.

_____, _____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then

explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>     Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult.  *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (citations omitted; emphasis added).  Therefore, on a habeas review of an ineffective

assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the

benefit of the doubt."  <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (quotation marks omitted;

emphasis added).  For the following reasons, the Court finds that, under those stringently

deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's

ineffective assistance of counsel claim.

As the state court correctly noted, <u>Strickland</u> established a two-prong test for evaluating

ineffective assistance of counsel claims.  Specifically, a petitioner seeking relief on such a claim

is required to show both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland, 466 U.S. at 697. A petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Matthesen v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability

is "a probability sufficient to undermine confidence in the outcome."   Id.   In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."   Crockett, 796 F.2d at 793.

Petitioner alleges that his counsel was ineffective in numerous ways.  The Court will address each allegation in turn.

First, petitioner alleges that counsel "failed to perform proper pre-trial discovery, investigate, interview and call witnesses."[36]  He further faults counsel for failing to secure funds to hire an independent ballistics expert to perform additional testing.[37]

As to the contention that counsel failed to conduct adequate discovery or investigate the case, the Court first notes that petitioner has not established that counsel's discovery and investigation were actually inadequate in any respect.  In fact, he has presented no evidence as to what investigative steps counsel actually took or failed to take.  Without such evidence, he cannot show that counsel performed deficiently.  Netter v. Cain, Civ. Action No. 15-584, 2016 WL 7157028, at *11 (E.D. La. Oct. 6, 2016), adopted, 2016 WL 7116070 (E.D. La. Dec. 7, 2016).

Further, even if petitioner had made that showing, he would then additionally have to prove that prejudice in fact resulted from the inadequate discovery and investigation. To make that showing, he must point to evidence in the record demonstrating that further discovery and investigation would have revealed additional information beneficial to the defense.  Because petitioner has not done so here, he has not established that he was prejudiced by counsel's

---

[36] Rec. Doc. 4-1, p. 43. Petitioner later makes a more specific allegation in his application concerning counsel's failure to contact the second victim in the shooting and to subpoena him to testify at trial.  That allegation is separately addressed infra.

[37] Id. at p. 45.

discovery and investigation (or lack thereof).  See, e.g., Diaz v. Quarterman, 239 Fed. App'x 886, 890 (5th Cir. 2007) ("A petitioner cannot show prejudice with respect to a claim that counsel failed to investigate and present mitigating evidence without adducing what the investigation would have shown."); Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. Moawad merely asserts that there might have been powder burns on Tubbs's hands; he does not point to any evidence in the record supporting this allegation." (citation and quotation marks omitted)); England v. Cain, Civ. Action No. 15-0961, 2015 WL 5971196, at *11 (E.D. La. Oct. 14, 2015) ("It is well settled that a habeas petitioner cannot show prejudice with respect to a claim that counsel failed to investigate a defense without adducing what the investigation would have shown. Instead, to prevail on such a claim, the petitioner must provide factual support as to what exculpatory evidence further investigation would have revealed." (citations omitted)); Harris v. Cain, Civ. Action No. 12-0297, 2014 WL 2465538, at *15 (M.D. La. May 30, 2014) ("A petitioner cannot show prejudice with respect to a claim that counsel failed to investigate without adducing what the investigation would have shown.... Mere speculation regarding what [testing] may have shown is not sufficient to establish deficient performance on the part of the petitioner's attorney." (citations omitted)).

As to the contention that counsel failed to interview and subpoena witnesses, that contention likewise fails.  The United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain.  For this reason, *we require petitioners making claims of ineffective*

> *assistance based on counsel's failure to call a witness to demonstrate prejudice by*
> *naming the witness, demonstrating that the witness was available to testify and*
> *would have done so, setting out the content of the witness's proposed testimony,*
> *and showing that the testimony would have been favorable to a particular defense.*
> This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets

omitted; emphasis added); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o

prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner

must name the witness, demonstrate that the witness was available to testify and would have done

so, set out the content of the witness's proposed testimony, and show that the testimony would

have been favorable to a particular defense.").

Here, petitioner has not identified the potential witnesses, proved that they were available

to testify at the time of trial, and, most importantly, proved that they in fact would have testified

in a manner beneficial to the defense. Therefore, he obviously failed to meet his burden of proof

with respect to this claim. See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983)

(courts view "with great caution claims of ineffective assistance of counsel when the only evidence

of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779,

2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009

WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such

witnesses would have testified; rather, a petitioner must come forward with evidence, such as

affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-

0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant

provides the court with affidavits, or similar matter, from the alleged favorable witnesses

suggesting what they would have testified to, claims of ineffective assistance of counsel fail for

lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Petitioner likewise has not shown that his counsel was ineffective for failing to secure funds to hire an independent ballistics expert to perform additional testing.  It is clear that, under Louisiana law, funds are available under some circumstances to hire various types of experts to assist in the defense of indigent defendants.  See State v. Touchet, 642 So. 2d 1213, 1215 (La. 1994).  However, the Louisiana Supreme Court has explained:

> [F]or an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial.  To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense.  If the trial court finds that the indigent defendant is able to meet this standard, it is to authorize the hiring of the expert at the expense of the state.

Id. at 1216.

Here, petitioner appears to suggest that ballistics testing should have been done in order to prove that there were in fact two shooters.  However, even if the Court assumes that there were two shooters and that a ballistics expert would have testified to that effect, that would not have benefited the defense.  The jury was already made aware that Roach at one point may have indicated that there were two shooters.[38]  Further, and more importantly, the evidence at trial clearly proved that **petitioner** was **a shooter**.  As such, his culpability would in no way have been

---

[38] See, e.g., State Rec., Vol. 6 of 8, trial transcript, pp. 117-19.

diminished even if an additional shooter was shown to have existed.  On the contrary, Louisiana law provides:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

La. Rev. Stat. Ann. § 14:24.  Therefore, under the Louisiana law of principals, **all** shooters in a murder are equally culpable, and it is of no consequence which of them fired the actual shots that hit the victim.  See, e.g., Washington v. Tanner, Civ. Action No. 13-6120, 2015 WL 13227943, at *14 (E.D. La. Dec. 11, 2015), adopted, 2016 WL 1253564 (E.D. La. Mar. 31, 2016); State v. Massey, 91 So. 3d 453, 463-64 (La. App. 5th Cir. 2012); State v. Page, 28 So. 3d 442, 449-50 (La. App. 5th Cir. 2009).

Second, petitioner alleges that counsel "failed to prepare and present a defense and subject the State's case to meaningful adversarial testing."[39]  Specifically, petitioner argues that counsel failed (1) to build a defense around a police report indicating that shell casings from two different guns were found at the crime scene and (2) adequately cross-examine the state's witnesses.

As to that first contention, as already noted, the number of guns and shooters involved is immaterial in light of the law of principals.  Therefore, a defense built around the contention that shell casings indicated that there was more than one shooter would have been meritless.  Counsel is not ineffective for failing to pursue a meritless defense.  See Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996) ("[I]f there exists no reasonable probability that a possible defense would have succeeded at trial, the alleged error of failing to disclose or pursue it cannot be prejudicial.");

---

[39] Rec. Doc. 4-1, p. 46.

United States v. Washington, Cr. A. 95-124-3 and Civ. A. 97-2371, 1997 WL 327459, at *2 (E.D. Pa. June 12, 1997) (counsel is not ineffective in failing to raise a meritless defense, because the outcome of the proceeding would not have been different if the defense had been raised).

As to petitioner's allegation that counsel failed to adequately cross-examine the state's witnesses, that contention has no merit.  As an initial matter, it must be noted that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment."  Ford v. Cockrell, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), aff'd, 135 Fed. App'x 769 (5th Cir. 2005); accord Lewis v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *8 (E.D. La. Oct. 16, 2009), aff'd, 444 Fed. App'x 835 (5th Cir. 2011); Williams v. Cain, Civ. Action Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *11 (E.D. La. May 7, 2009), aff'd, 359 Fed. App'x 462 (5th Cir. 2009); Packnett v. Cain, Civ. Action No. 06-5973, 2008 WL 148486, at *11 (E.D. La. Jan. 10, 2008); Parker v. Cain, 445 F. Supp. 2d 685, 710 (E.D. La. 2006).  The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such tactical matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.  Moreover, it is irrelevant that another attorney might have made other choices or handled such issues differently.  As the Supreme Court noted:  "There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  Id.

Further, in any event, the Court has reviewed the transcript in its entirety, and that transcript reflects that defense counsel's cross-examination of the state's witnesses was vigorous and

effective.  The fact that Roach had made inconsistent statements was fully explored, as was the fact that no one other than Roach witnessed the actual shooting.  Without evidence that other potentially fruitful avenues for cross-examination existed but nevertheless went unpursued, petitioner cannot establish either that his counsel performed deficiently in this respect or that prejudice resulted.[40]

Third, petitioner alleges that counsel was ineffective for failing "to object to the Prosecutor's impermissible and prejudicial comments during closing arguments."[41]  However, "a decision of counsel to forgo a particular objection is generally one of trial strategy, and, as such, is normally insufficient to support an ineffective assistance claim." Rick v. Cain, Civ. Action No. 12-2617, 2013 WL 6388641, at *7 (E.D. La. Dec. 4, 2013); accord Rios-Delgado v. United States, 117 F. Supp. 2d 581, 589 (W.D. Tex. 2000) ("Generally speaking, a failure to object, standing alone, does not rise to the level of constitutionally deficient performance. In cases where an accused complains that counsel was ineffective because he did not object to something ..., the courts grant significant deference, as such actions fall squarely within the ambit of trial strategy."). Decisions regarding whether to object to comments made in closing arguments clearly fall within that general rule.  See, e.g., Drew v. Collins, 964 F.2d 411, 423 (5th Cir. 1992) ("A decision not

---

[40] For example, petitioner argues that counsel was ineffective for failing to cross-examine Roach and Arce as to the circumstances of their identifications in the photographic line-ups.  He opines that such questioning *might have revealed* that Chambers employed the same suggestive technique on those occasions as he did to secure the identification by Thornsbery.  See Rec. Doc. 4-1, p. 51. However, that contention is meritless. First, there is no reason to believe that Chambers employed the same tainted technique to secure the identifications by Roach and Arce.  As previously explained herein, Roach and Arce, unlike Thornsbery, would have required no prompting to select petitioner's photograph, in that they actually either saw or knew him.  Second, because counsel chose to forgo that line of cross-examination, Roach and Arce had no opportunity to *expressly deny* that Chambers acted improperly – a strategy that left the jurors to free speculate without contradiction that Chambers *might have* employed the same improper technique.  Based on those considerations, there is simply no basis for concluding that counsel's cross-examination of Roach and Arce was deficient in this respect or that any prejudice resulted.

[41] Rec. Doc. 4-1, p. 53.

to object to a closing argument is a matter of trial strategy."). Moreover, even where an objection might have some small chance of succeeding, an attorney is allowed to make a strategic choice to forego such an objection to avoid antagonizing the jury. See Wiley v. Puckett, 969 F.2d 86, 102 (5th Cir. 1992). Such deference to counsel's strategic choices is particularly appropriate here because, if counsel had objected, he would have invited the jurors to focus their attention on the prosecutors' comments, which jurors may not consider as evidence in any event, and perhaps thereby inflated their importance in the jurors' minds. Counsel can hardly have been deemed to have performed ineffectively in choosing to avoid that unnecessary risk.

Further, in any event, the comments petitioner argues should have been challenged were arguably within the acceptable parameters of argument for the reasons previously explained, and so the objections he proposes appear to lack merit. Obviously, a "[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite." Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994).

Fourth, petitioner argues that counsel was ineffective for failing to utilize a police report identifying Samuel Simms as a second person shot during the underlying altercation. He argues that defense counsel should have located Simms and subpoenaed him to testify at trial.[42] In support

---

[42] Rec. Doc. 4-1, pp. 58-62. The state argues that these claims, which were presented in a supplement to petitioner's state post-conviction application, are both unexhausted and procedurally defaulted. See Rec. Doc. 20, pp. 6-7. However, as explained previously, a federal court has the authority to deny an unexhausted claim on the merits. See supra note 27. Likewise, a federal court need not decide whether a claim is procedurally barred if the claim clearly fails on the merits. Glover v. Hargett, 56 F.3d 682, 684 (5th Cir. 1995); Wiley v. Puckett, 969 F.2d 86, 104 (5th Cir. 1992); Lande v. Cooper, Civ. Action No. 11-3130, 2013 WL 5781691, at *26 n.68 (E.D. La. Oct. 25, 2013); Corzo v. Murphy, Civ. Action No. 07-7409, 2008 WL 3347394, at *1 n.5 (E.D. La. July 30, 2008); Lee v. Cain, Civ. Action No. 06-9669, 2007 WL 2751210, at *9 (E.D. La. Sept. 18, 2007). Because these claims have no merit in any event, the undersigned recommends that they simply be denied on that basis out of an abundance of caution.

of this argument, petitioner has provided a purported affidavit executed by Simms in 2014. In that affidavit, Simms states in pertinent part:

> I am the victim on a violent shooting. Me and a friend of mine named Terrell Bart was sitting on a porch smoking, when two black males with tattoos on their faces approached us and pull guns out and started shooting. I was shot. Terrell Bart was killed. There was no witnesses to this shooting.
> I just learned that Karl Peters has been accused of the killing of Terrell Bart. Karl Peters did not shoot me nor kill my friend Terrell Bart.[43]

As an initial matter, the Court notes that there was no exculpatory information contained in the underlying police report.[44] Although it identified Simms as the second person shot in the incident, it specifically stated that "[d]ue to Mr. Sims [sic] serious condition, he could not give a statement." Therefore, nothing in the report indicated that Simms would have contradicted Roach's identification of petitioner as the shooter.

In any event, even if the Court assumes that counsel failed to make any attempt to locate and question Simms, *facts which have not been established,* petitioner has not shown that he was prejudiced by either that failure or counsel's failure to subpoena Simms to testify at trial. And, contrary to petitioner's suggestion, Simms' affidavit is insufficient to prove otherwise for several reasons.

First, as noted, the affidavit did not surface until 2014, and petitioner has not established that counsel could even have located Simms at the time of the trial *more than two years earlier*.

Second, it must be noted that, at the time of trial, Simms was apparently considered by law enforcement officials to be *an accomplice* to the crime, *not a victim*. In her opening statement, the

---

[43] Rec. Doc. 4-1, p. 7.
[44] A copy of the police report is attached to petitioner's "Motion for Leave and Permission to File a Supplement to Pending Application for Post-Conviction Relief" in Volume 1 of the state court record.

prosecutor stated:  "[Karl Peters] accidentally hit Samuel Simms in the meantime, who was standing on the porch, probably to lure the door open for Terrell Bart to come outside, holding a conversation with him, to make Terrell Bart accessible to the shooter, Karl Peters, who was coming around the front of the house with a gun."[45]  She later stated:  "Samuel Simms accidentally got hit; not an intended target.  He ran through the back of the house, kept running, and refused to ever cooperate with the police, likely since he probably orchestrated Karl Peters having the ability to shoot Terrell Bart by luring him out onto the front porch."[46]

Third, and most importantly, the affidavit does not contain all of the information required by federal law.  As previously noted in this opinion, it is not enough for a petitioner to show that an uncalled witness's testimony would have benefitted the defense; the petitioner must additionally "demonstrate that the witness *was available to testify and would have done so*."  Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) (emphasis added).  The United States Fifth Circuit Court of Appeals has cautioned that this requirement "is not a matter of formalism."  Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010).  Affidavits, such as Simms' affidavit, that omit those critical assurances are simply insufficient to support an ineffective assistance claim.  See, e.g., Turner v. Epps, 412 Fed. App'x 696, 706 (5th Cir. 2011); Woodfox, 609 F.3d at 808; Hooks v. Thaler, 394 Fed. App'x 79, 83 (5th Cir. 2010); Gray v. Epps, 616 F.3d 436, 443 (5th Cir. 2010); Day, 566 F.3d at 538; Bray v. Quarterman, 265 Fed. App'x 296, 299 (5th Cir. 2008); Deckelman v. Tanner, Civ. Action No. 13-6303, 2015 WL 4647910, at *13 (E.D. La. Aug. 4, 2015).  Therefore, petitioner's claim fails for this reason alone.[47]

---

[45] State Rec., Vol. 6 of 7, trial transcript, p. 9.

[46] Id. at p. 11.

[47] Of course, although it is not determinative in light of petitioner's insufficient proof in support of his claim, the Court notes that there is reason to believe that Simms would not in fact have been willing to testify at trial.  Because he was

Lastly, petitioner argues that even if his separate contentions regarding counsel's ineffectiveness do not warrant relief when considered individually, relief is warranted if they are considered cumulatively.[48]  He is incorrect.  Where, as here, a petitioner has failed to show that his counsel was ineffective in any respect, "there is nothing to cumulate."  Villaneuva v. Stephens, 555 Fed. App'x 300, 308 (5th Cir. 2014); accord United States v. Thomas, 724 F.3d 632, 648 (5th Cir. 2013) ("[T]here is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in Strickland."); Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir. 2008) ("[T]he district court noted that '[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised'.  We agree."); United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions.").  As the United States Fifth Circuit Court of Appeals noted with respect to analogous claims of cumulative error:  "Twenty times zero equals zero."  Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Karl Peters be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from

---

suspected of being an accomplice in the shooting, it is doubtful that he would have made himself available to testify and risk prosecution for his suspected role in the crime.
[48] Rec. Doc. 4-1, pp. 56-58.

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc). [49]

New Orleans, Louisiana, this eighteenth day of July, 2018.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[49] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.